IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 22, 2003

## STATE OF TENNESSEE v. CHRISTOPHER ALAN WHITE

**Appeal from the Circuit Court for Blount County**
**No. C-11580     D. Kelly Thomas, Jr., Judge**

_____

**No. E2002-00716-CCA-R3-CD**
**June 3, 2003**
_____

The defendant, Christopher Alan White, appeals as of right his conviction by a Blount County Circuit Court jury for aggravated assault and the resulting ten-year sentence as a Range II, multiple offender.  He contends that (1) the evidence is insufficient to support his conviction, (2) prosecutorial misconduct during closing argument required a mistrial, and (3) his sentence is excessive.  We affirm the trial court's judgment of conviction.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, Jr. and NORMA MCGEE OGLE, JJ., joined.

Raymond Mack Garner, District Public Defender (on appeal); and Eugene B. Dixon, Maryville, Tennessee (at trial), for the appellant, Christopher Alan White.

Paul G. Summers, Attorney General and Reporter; Peter M. Coughlan, Assistant Attorney General; Michael L. Flynn, District Attorney General; and Ellen Lee Berez and William Reed, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case arises out of the beating sustained by Jennifer White, the defendant's wife, late in the afternoon of December 26 through early on the 28th, 1998.  The victim testified that during the summer of 1998, she and the defendant were separated and that she had filed for divorce.  She said that during their separation, she dated other men and frequently drank alcohol and smoked marijuana for a month and one-half.  She said that her mother cared for her and the defendant's five-month-old son while she was drinking and using drugs and that the baby was not neglected.  She said that when the defendant, who had been away for three months, returned, they reconciled, and she told him that she had dated other men.

The victim testified that on December 26, 1998, she, the defendant, and their son returned from a Christmas visit with her family and, following a nap, prepared to go visit the defendant's family around 4:00 p.m. She said that the defendant was angry because they had not visited his family on Christmas and that he began to yell at her about the events of the preceding summer, calling her a "stupid whore" and a "G. D. slut." She said that she returned the baby to his crib because she did not want their son around the defendant when he was angry. She said that upon her return to the bedroom, the defendant continued to yell at her and that his eyes were "evil looking" and filled with hatred and rage. She said she grew afraid, started to leave the room, and was so upset that she could not stop shaking when he ordered her back onto the bed. She said that her shaking made him angrier and that he said he would "knock the shit out of" her if she did not stop shaking. She said he threw his fist back, broke a lamp, and then accused her of not caring about the lamp, which had been a wedding gift, because she had never really cared about their marriage. She said that he threw a piece of the broken glass at her, cutting her arm. He slapped her backward, she fell onto the bed, and he began slapping and knocking her around while continuing to yell and make accusations.

The victim testified that she wanted to leave the bedroom because she feared the defendant might retrieve the gun from the closet and shoot her. She said he knocked her to the floor and kicked her in the back, legs, stomach, face, and arms as she tried to crawl away. She said that as he kicked her, he ordered her to get up but that he had knocked the breath out of her. She said he yanked her up by her hair, threw her into the wall, held her there yelling at her, and then threw her onto the bed. She said that the defendant continued to beat her and that she attempted to kick him off her. She said he began slapping her face, which frightened her because he usually refrained from hitting her face in order that no one would see her injuries. She said she was crying and asking him not to hit her face. She said he believed that she did not want him to hit her face because she wanted people to look at her and began choking her. She said he threatened to bruise her face or pour acid on it to prevent anyone from ever looking at her again. She said that she passed out briefly and that when she regained consciousness, he was still choking her. She said that she could not breathe and that that her face was bleeding. She said he knocked her over, and as she tried to crawl away, he punched her back, which hurt badly. She said that the defendant kneed her between her legs causing her to "arch up" and that he bit her on her back and neck. She said that at this point, she felt searing pain all over that was worse than the pain of childbirth. She said that every muscle hurt and that she felt as if every bone were broken. She said that her nose and neck were bleeding and that she was coughing up blood.

The victim testified that the defendant told her she needed to clean up and took her to the bathroom. She said he retrieved an ice pack and applied it to her injuries. She said he apologized but then became angrier, asked if she were afraid of him yet, and said he bet that she would never cheat on him again. She said that he pushed her into the bathtub where he hit and slapped her and that she slipped on some spilled Noxema and fell. She said he yanked her by her hair and hit her face into the faucet three or four times. She said that when she asked to get out of the tub, he pushed her out, grabbed her head, and knocked it onto the bathroom floor. She said that the defendant

gripped her waist-length hair and threw her head against the sink and toilet. She said that she was crying and begging to leave the bathroom because she knew the beating was going to continue.

The victim testified that the defendant knocked her into the hallway and that her head hit the wall. She said that she ran out the backdoor because she knew the defendant would not hit her outside. She said the defendant ordered her back into the house saying that he was punishing her for what she did last summer. She said he allowed her to stay outside for a little while because she was vomiting. She said that after he told her to come inside, she ran into the kitchen where he knocked her onto the floor and began kicking her again. She said that the baby was crying and that she begged to be allowed to care for him. She said the defendant told her he was not finished with her yet; knocked her head into the stove, denting it; and knocked her into the table. She said that eventually, he allowed her to prepare the baby's bottle but continued to beat her while she heated the water. She said that she began to change the baby's diaper but that the defendant refused to allow it, knocked her around while she was holding the baby, and tossed the baby into his crib. She said she went into the living room to draw the defendant away from the baby.

The victim testified that the defendant continued to yell at her about the events of the summer and threw their Christmas gifts at her, including his new boots. She said that she ran toward the front door and that the defendant caught her, threw her to the floor, and kicked and choked her until she passed out. She said that when she regained consciousness, the defendant was dragging her to their bedroom by her hair. She said that at this point, it was 11:00 p.m. or midnight and that the defendant had been beating her for seven or eight hours. She said she was still in pain, crying, and begging him to stop. She said he threw her onto the bed and pushed her face into a pillow until she could not breathe. She said the defendant continued to punch, bite, kick, and slap her. She said that at one point, he allowed her to feed the baby but slapped her out of her chair while she was feeding him. She said the defendant scratched the baby while slapping her because she was taking too long to change the baby's diaper. She said she told the defendant to leave the room because she was afraid the baby would get hurt.

The victim testified that when she returned from putting the baby to bed, the defendant was waiting for her on the sofa and told her to sit down because they were going to discuss the events of the past summer. She said that she answered the defendant's questions and that they went over everything again. She said the defendant said he should get her high and drunk because she would "party" with everyone but him. She said the defendant had used "crank" earlier and used some more then. She explained that crank was crystal methamphetamine, a drug that gives one a lot of energy and prevents sleep. She said that she refused to use crank with him and that he knocked her backward causing her head to hit a table. She said she smoked marijuana with him because he threatened to kill her if she refused. She said that the defendant resumed beating her and that she ran outside where she vomited blood and coughed up blood. She said that although he brought her ice packs, he continued to yell at her. She said that once they were back inside, the defendant beat her again in the bedroom and the kitchen. She said the defendant stopped beating her to allow her to feed and change the baby again but resumed the beating after she put the baby to bed. She said he beat her again in the living room and the kitchen before she went outside to get some air and to

vomit. She said when she came back inside, the defendant put ice on her eye because he wanted it to heal faster. She said that the defendant went to sleep and that after she fed the baby, she went to sleep in the bed beside him. She said at this point, it was 6:00 a.m. on December 28, 1998.

The victim testified that she did not run away during the times that she escaped outside because she would not leave the baby. She said that she knew the defendant could catch her. She said the defendant hid her car keys and made sure her car had very little gas to prevent her from leaving while he was gone. She explained that she did not leave with the baby after the defendant had fallen asleep because she was afraid. She said that she had left before and that the defendant knew where to find her. She said the defendant sent her to the baby's room when his mother came to their house between 11:00 a.m. and noon on December 28 but then allowed her to come out because his mother knew she was hurt. She said that while the defendant was at the grocery store, his mother encouraged her to see a doctor but that she declined because the defendant had not given her permission to leave the house. She said that her face, head, back, and ribs hurt and that it hurt to breathe, cough, talk, or walk.

The victim testified that she was asleep and the defendant was watching television when the police came around 12:00 or 12:30 a.m. She said that an officer followed the defendant toward the bedroom but that he told the officer that she was not decent even though she was fully dressed. She said the defendant came into the bedroom and said if she told the police what had happened, that he would kill her and that she would never see her son again. She said the defendant sat on the sofa beside her and held her hand while the officers questioned her. She said when they asked her what happened, she looked to the defendant and said she did not know. She said the defendant told them that some unknown women had attacked and beaten her outside their home. She said she told the police this was true because she knew that the defendant would find her where ever she went.

The victim testified that one of the officers took the defendant outside while the other questioned her alone. She said she could hear the defendant objecting loudly and saying that men were not allowed to be alone with her. She said the officer told her that he knew the defendant caused her injuries and that if she allowed them to take the defendant to jail, she would not have to go through this anymore. She said she thought that if the defendant went to jail, he would quickly make bond, find her, and kill her. She said she told the officer that she had told him the truth, that the defendant did not touch her, and that she did not know who had caused her injuries. She said one of the officers photographed her facial injuries before she went to the emergency room in an ambulance. She said the defendant followed her to the hospital and sat in the lobby with their son while she was examined. She said she told the emergency room doctor that she did not know who did this to her because she knew the defendant was just outside with her son.

The victim testified that Shannon Carswell from the Domestic Violence Unit called their home sometime after the incident. She said that the defendant was sitting across from her and that she told Ms. Carswell she did not know who hurt her, the defendant had not laid a finger on her, and to leave her alone. She said that on February 4, 1999, while at a battered woman's shelter, she spoke with Ms. Carswell again and told her the truth about the beating.

The victim testified that she had to have surgery to push her left eye back into its socket. She said she could not see out of that eye, which remained swollen and mostly shut for a month. She said she continued to see double and was sometimes unable to see out of her left eye. She said the left side of her face was swollen each morning, that she had muscle spasms, and that her teeth tingled. She said that she had pain in part of her face and inside her mouth at the site of the surgical incision.

On cross-examination, the victim testified that after the defendant left town in the summer of 1998, she stayed with his uncle and aunt, the Bennett, Sr., family, for two or three weeks before she filed for divorce. She said she left because his aunt and uncle made it clear they did not want her and because the defendant's mother came to town and needed a place to stay. She said the defendant's relatives never said they disapproved of her conduct around her child or suggested it was inappropriate for her and the baby to leave the house after midnight and not return until the next morning. She said they had understood that she was leaving to be with her sister who had recently been raped. She said she had felt that it was okay to date after filing for divorce. She said that in December 1998, she did not see Jason Jones or the other men whom she had dated the previous summer. She admitted that once when she was late returning Mr. Jones' car, he had pushed her into his door. She said she told Mr. Jones that she would not put up with that and never saw him again.

The victim agreed that when she spoke with the officer alone on December 29, she could have told him that the defendant had threatened to kill her. She agreed that she told Dr. Kiriluk, the emergency room doctor, that she was getting out of her car at her house when someone hit her in the back of the head, choked her, and beat her head with a board. She explained that she gave this account because this was the story she and the defendant had already told the police and because an officer was in the room while the doctor questioned her. She said the police interviewed her again at the hospital without the defendant around. She said she also told this story to her next-door neighbors Tanya and Gene Bennett, Jr., who were related to the defendant. She agreed that she had a telephone in her home and that the defendant left the house on occasion after the incident. She said he did not leave often because at the time of the offenses, he supported their family by selling drugs to Gene Bennett, Jr., who then resold them. She said the defendant did not begin working construction with Mr. Bennett, Jr., until the January after the incident.

The victim admitted that on February 11, 1999, the defendant filed for divorce and asked for joint custody of their son. She said this surprised her because the defendant had not previously said he would file for divorce or seek legal custody of their son. She said that she did not want the defendant to have anything to do with their son and that she wanted sole custody. She said she told Ms. Carswell the truth about the incident on February 4, 1999, before the defendant filed for divorce. The victim said she refused to sign an affidavit prepared by defense counsel that gave the same account of the cause of her injuries that she had given to the police, Dr. Kiriluk, her neighbors, and emergency room personnel. She denied asking the defendant to have his attorney draw up the affidavit and said that the defendant told her he was having his attorney prepare a document, which she must sign or he would kill her. She said that at the time, the defendant was in jail for the present charges but was having someone follow her. She acknowledged that she and the defendant were still married at the time of trial but said that she had talked with attorneys in Blount County and in

Dalton, Georgia, where she was now living, about getting a divorce. She said that she saw her surgeon about her double vision before she moved to Georgia. She said she had not seen a doctor about her continuing symptoms after she moved because she had no insurance and could not afford it.

Patrolman Scott Spicer of the Blount County Sheriff's Office testified that on the evening of December 28, 1998, he and Officer Russell Hatcher were dispatched to investigate a possible domestic assault. The defendant invited him into the house and summoned the victim, whom the defendant said was lying down. Officer Spicer testified that upon seeing the injuries to the victim's face and neck, he believed she needed medical attention. The victim said she did not think she needed medical care but seemed "very unsure." The defendant and victim sat on the couch together holding hands. Officer Spicer said the defendant seemed nervous and the victim seemed confused and afraid. When he asked the victim a question, she would look at the ground or at the defendant, and the defendant would quickly answer the question for her. The defendant told him that the victim had been "jumped" in the front yard by unknown assailants who then ran away, but the couple gave no reason for the assault. After he asked the defendant to stop answering his questions to the victim, the victim would only respond "like he said" to Officer Spicer's questions. When asked if the defendant caused her injuries, the victim looked at the floor and said "No." Officer Hatcher spoke with the defendant outside while Officer Spicer spoke to the victim. Officer Spicer said the victim was still reluctant to speak and answered only "It's like he said." He called an ambulance to take the victim to the hospital, and the defendant drove his own car to the hospital and remained there while the victim was treated.

On cross-examination, Officer Spicer testified that the defendant voluntarily went outside with Officer Hatcher and that the victim agreed with the defendant's explanation of her injuries. He said he did not recall seeing any bruises on the defendant's hands. He said that the defendant asked to ride in the ambulance with the victim but that he did not allow it. On redirect examination, he said that the defendant gave the first explanation of how the victim was injured.

Dr. Randy Kiriluk, an emergency room physician at Blount County Memorial Hospital, testified that he treated the victim on the evening of December 28, 1999. He said she was shaking, upset, nervous, and crying. She had bruises and abrasions on her face and neck, abrasions on her back, and bruises on her body. She had a "blow-out" fracture of the orbit around her left eye accompanied by a lot of swelling and bruising. Dr. Kiriluk could not determine whether she had sustained nerve damage to the area because she could not open her left eye. He said her eye injury was painful and could present a substantial risk of death if a bone fragment penetrated her brain.

On cross-examination, Dr. Kiriluk acknowledged that the victim told him that she was hit in the back of the head by an unknown assailant as she was getting out of her car at her house. He said she told him the assailant choked her and beat her head with a board. He agreed that the victim's patient history states that she emphatically denied that her husband had attacked her and that she gave a similar account to police officers who interviewed her at the emergency room. He admitted that a bone fragment did not penetrate the victim's brain. He agreed that his notation on

the victim's records that her pupils were equal, round, and reacted to light indicated that the victim did not have a neurological problem. He said that the victim's injuries could have occurred over a period of time but that her eye injury was less than two or three days old. He agreed that the victim did not need a narcotic for pain or to be admitted to the hospital. He admitted that the records did not reflect that he instructed the victim to take over-the-counter medicine for pain but explained that he might have simply failed to document this. He agreed he had seen boxing matches in which a boxer was allowed to continue boxing despite having an eye swollen shut.

Gene Allen Bennett, Sr., the defendant's uncle, testified that the victim and her infant son had lived in his home for a couple of weeks in the summer of 1998 while the defendant was out of town. He said that the victim would regularly leave with the baby in the middle of the night and not return until daylight. He said he did not approve of this and ultimately asked the victim to leave. He said he was not aware of the victim and defendant being legally separated during this time. He said that when he saw the defendant again, he told the defendant about the victim's leaving in the night with the baby. He said the defendant told him that the defendant was going to file for divorce and seek custody of his child.

Mr. Bennett, Sr., testified that upon the defendant's return, the defendant worked in his roofing and remodeling business in October, November, and December 1998. He said that from 9:00 a.m. to 4:30 p.m. on December 26, 1998, he and his employees, including the defendant, installed baseboards and trim in a house that he was repairing for resale. He said the defendant was on the job site all day and left only briefly for lunch. On cross-examination, he said he was asked to remember the events of December 26, 1998, only a couple of weeks before trial. He acknowledged that he did not know where the defendant and victim spent Christmas Day or who injured the victim.

Gene Bennett, Jr., testified that in December 1998, he and his wife lived next door to the defendant and victim and that their mobile homes were about fifty feet apart. He said that he and the defendant worked in his father's roofing and remodeling business and that the defendant rode to work with him. He said that when he went to the defendant's house on December 26, 1998, to awaken him for work, the defendant was lying on the couch while the victim made coffee. He said that the defendant and victim were not having any problems that morning and that the victim did not look like she did in the photographs taken by the police. He said that he and the defendant left work around 5:30 p.m. or earlier and that it took thirty minutes to drive home. He said he went outside about thirty minutes after he returned home from work and saw the victim drive up to her trailer and go inside. He said that even though her hair was down, he could see that the left side of her face was swollen. He said the sun was setting but it was not yet dark. On cross-examination, he said that he noticed the victim's swollen face while she was on her porch about to enter her home and that she had her child with her. He said that he and defense counsel had discussed the events of December 26, 1998, a lot over an extended time period and that his father had discussed it with them.

The Reverend Ron Oliver, a Church of God minister and grading contractor, testified that he had known the victim since she was a small girl and that she had attended churches where he was a minister. He said that he had known the defendant for three or four years and had performed the

defendant's and victim's marriage ceremony two or three years ago. He said that the victim's reputation for truthfulness in the community was bad and that she should not be believed under oath. On cross-examination, he said that he had talked with the defendant but not the victim about the facts of the case.

Based upon this evidence, the jury convicted the defendant of aggravated assault.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his aggravated assault conviction. He argues that the victim repeatedly told numerous people that she was attacked outside her home by an unknown assailant and that this evidence outweighs her uncorroborated testimony that the defendant beat her. In support of this assertion, he notes that the victim did not tell anyone that the defendant had caused her injuries until some six weeks after the incident. The state argues that the evidence is sufficient. We agree with the state.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Aggravated assault as charged in the present case is the knowing assault of another that causes serious bodily injury. See Tenn. Code Ann. § 39-13-102(a)(1)(A). "Serious bodily injury" is defined as "bodily injury which involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; or (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." Tenn. Code Ann. § 39-11-106(a)(34). Taking the evidence in the light most favorable to the state, the victim testified that she was hit, punched, slapped, kicked, bitten, and knocked around by the defendant over the course of approximately thirty-six hours. During this time, the victim repeatedly escaped outside to vomit or cough up blood. She often begged the defendant to stop the beating or to move to other rooms in their home in order to avoid additional injury or to draw him away from their child. She said the defendant applied ice packs to her injuries yet resumed the beating. She testified that as a result of the beating, she felt a searing pain that was worse than the pain of childbirth. Regarding her injuries, the victim testified that she could not see out of her swollen left eye for a month and continued to experience periods of double vision or blindness in that eye. Dr. Kiriluk testified that the victim's eye injury presented a substantial risk of death in that a bone fragment from her fractured orbit could have penetrated her brain. This evidence is sufficient to support the aggravated assault conviction.

The defendant essentially argues that the jury should not have believed the victim's trial testimony but, instead, should have accredited the initial explanation of her injuries that she gave police, Dr. Kiriluk, her neighbors, and Shannon Carswell in the hours and weeks following the offense. He emphasizes that she did not tell anyone that he caused her injuries until six weeks after the incident. He argues that in the absence of corroboration of the victim's trial testimony, her statements to police and her treating physician that he did not injure her outweigh her testimony. Generally, a conviction may rest upon the uncorroborated testimony of a single witness. State v. Wyrick, 62 S.W.3d 751, 767 (Tenn. Crim. App. 2001). In the present case, the victim's testimony that she lied to police and Dr. Kiriluk because she was afraid of the defendant is corroborated by Officer Spicer's testimony that she was afraid and looked to the defendant to explain her injuries to him. Also, defense witness Gene Bennett, Jr.'s testimony that he saw the victim drive to her trailer and enter her home with a swollen face contradicts the victim's account to Dr. Kiriluk that she was attacked outside her home as she was getting out of her car. It is the province of the jury to weigh competing evidence. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987) (holding that the credibility and weight to be given to a witness's testimony are issues to be resolved by the trier of fact). The jury heard the defendant's theory of the case and obviously accredited the victim's testimony at trial. The defendant is not entitled to relief on this issue.

## II. PROSECUTORIAL MISCONDUCT

The defendant contends that the trial court should have granted a mistrial when the prosecutor commented upon his silence during closing argument. The state contends that the defendant did not object to the argument at trial and that the argument in question was not a comment upon the defendant's decision not to testify. During rebuttal argument, the prosecutor noted that Reverend Ron Oliver had talked with only the defendant about the facts of the case. He then argued: "And let me ask you . . . to consider this as well: Reverend Oliver was asked about his opinion about Mrs. White's reputation for truthfulness. But did [defense counsel] ask him about anyone else's reputation for truthfulness? That's the question that wasn't asked." The defendant's failure to object to this argument at trial waives our consideration of this issue on appeal. See T.R.A.P. 36(a) (providing that relief is not required for a party who failed to take reasonably available action to prevent or nullify an error); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (holding that the defendant's failure to object to the state's alleged misconduct during closing argument waives that issue). Furthermore, we discern no plain error upon the record as the argument in question does not comment upon the defendant's silence but upon that of Reverend Oliver, who testified that he had discussed the facts of the case with the defendant yet gave no opinion of the defendant's reputation for truthfulness.

## III. SENTENCING

The defendant contends that his ten-year sentence is excessive because the trial court misapplied enhancement factor (8), that he has a previous history of unwillingness to comply with the conditions of a sentence involving release into the community. See Tenn. Code Ann. § 40-35-

114(8) (Supp. 2001) (amended 2002).[1] He argues that the trial court applied factor (8) because he was on parole when he committed the present offense. He concludes that this does not constitute a "previous history" of unwillingness to comply with a sentence of release. He also suggests that the trial court should have given more weight to mitigating factor (11) and asks this court to reduce his sentence to seven years. The state argues that the trial court properly sentenced the defendant.

At the sentencing hearing, Crystal Bailey, the defendant's first wife, testified that she and the defendant were married from October 1988 to September 1992. She said that when she was seventeen years old and not yet married, the defendant choked her in the back room of a business where he worked, leaving marks on her neck. She said that after they were married, he hit her with his fist in several rooms of their apartment over the course of two hours because she had discovered him at a restaurant with another woman earlier that day. She said that she suffered black eyes and a bloody nose as a result of the beating. She testified that on another occasion, the defendant smacked her on the head and threw a hotdog at her because it had coleslaw on it. She said that in late September 1991, the defendant beat her over the course of several hours in several rooms of their home. She said he kicked her while she was on the bathroom floor and hit her head against the wall causing a large hole in the wall. She said that when he tried to hit her head with a chair, he caused a metal curtain rod to cut her head. She said that in addition to the cut on her head, she had bruises on the side of her face and was sore from being kicked in the stomach. She said the defendant used marijuana, cocaine, and another drug during their marriage. On cross-examination, she said she was too afraid to call the police after the violent incidents because she feared her situation would be worse when the defendant got out of jail. She admitted she used cocaine but not as frequently as the defendant. She denied that she did not want the police to come to her home because she had drugs there.

The victim testified to four incidents of violence at the hands of the defendant other than the beating for which he was convicted at trial. She said that after they had been married two weeks, the defendant slapped her in the car causing her head to hit the car window and busting her lip because he did not like her comments about a church sermon. She said that on one occasion, the defendant awakened her by "whooping" her with a belt because she had gone to sleep without putting the dishes on the drainboard away. She said that before Thanksgiving in 1997, the defendant choked her against the kitchen wall because he did not want to go to her mother's home. She said that she did not keep a January 10, 1999 doctor's appointment for a checkup following the surgery on her left eye because the defendant had hit her in that eye and blackened it again. She said she did nothing to provoke any of these incidents and that she did not go to the hospital because she feared the defendant's anger. On cross-examination, she admitted that she had no exterior scars from the injuries relating to the present case and had not been told that her eye was permanently injured. She said that her vision did not prevent her from driving.

---

[1]The legislature's 2002 amendment, not applicable here, added as the new enhancement factor (1) that the "offense was an act of terrorism" but changed the existing enhancement factors only in increasing their designating number by one.

Jane Lynell Bennett, the defendant's aunt, testified that he was always very gentle and loving with his infant son and participated in feeding, diapering, and caring for the baby. She said that she saw the defendant's son around the time of his last birthday and that the child insisted on seeing a photograph of the defendant before he would go to sleep. She said that she and her husband helped the defendant and his family by allowing them to live on their property but that otherwise, the defendant supported his family. She said she never thought that the defendant had a substance abuse problem or saw him intoxicated. On cross-examination, she said that when she picked up the defendant's mother at the defendant's trailer after the offenses, the victim's face was swollen, and the victim looked bad.

The then thirty-one-year-old defendant testified that he spent nearly five years in prison during which he was involved in programs for substance abuse and anger management as well as church and religious activities. He said he then successfully served two years on parole and passed numerous drug screens. He said he had to serve ninety days for missing a parole appointment, a technical violation of his parole. He said that during this time, the victim expressed her love for him in letters and telephone calls and brought their son to visit him at the prison in Nashville. He said that she was married to him during this time and that her trial testimony was the first he had heard of their separation or her filing for divorce. He said she later told him she had many affairs while he was incarcerated. He said that sometimes she would be with other men when he called her from prison and that she later admitted that her boyfriend was waiting in the car when she came to visit him. He said that upon his release, he tried to forgive her and reconcile in order that his son would have a father. He said the victim continued to give him graphic details of what happened in his absence and it "destroyed [his] mind."

The defendant testified that they spent Christmas Day with the victim's father in Georgia but returned to their Blount County home late that night because he had to work the next day. He said he returned home from work between 4:00 and 5:00 p.m. on December 26. He said that in the early morning hours of December 27, the victim told him that she had needed money for drugs and had performed oral sex on a man while their son crawled on the floor nearby and pulled her hair. He said that he "snapped" and blacked out for a few seconds or minutes. He said he did not know what happened during his black out, but he admitted hitting the victim with his fist and causing her injuries. He denied the beating had lasted thirty-four hours.

The defendant testified that the victim had become pregnant with their son about a month after they married and that he had attended Lamaze classes and supported the victim through her pregnancy. He said he enjoyed a close bond with his son from birth and had worked to provide for him. He said that although he was working, he would get up in the night to feed and diaper his son. He admitted that because of the present conviction, his parole had been revoked on a sixteen-year-sentence. He said that he knew he had to pay for the serious mistakes he had made but asked that he not be kept away from his son for the rest of his life.

On cross-examination, the defendant acknowledged that in 1991, he received probation for two robbery convictions. He agreed that while on probation, he committed and was convicted of

aggravated robbery for which he received a consecutive ten-year sentence as a Range I offender. He said he began serving his effective sixteen-year sentence in 1992 and served close to five years before being paroled. He denied using drugs or drinking at the time of the present offenses. He said that the victim had fabricated a lot of her testimony about the incident and denied preventing her from tending to their son when he cried.

The defendant testified that he did not dissuade the victim from telling about her injuries and, in fact, told his mother to call an ambulance. He said the victim refused to seek treatment because she feared that he would get into trouble and be taken from her and their son. He agreed that the victim told the police that she was mugged by someone else and said that he was nervous and went along with her story. He said that while he was outside with one of the officers, he agreed with the officer that the victim's story was unbelievable. He admitted that he did not tell the officer that he injured the victim. He said the victim wrote him a letter after the offense saying she and their son loved and missed him and wanted to do whatever it took to get him out of prison. He said she asked him to send an affidavit for her to sign.

The presentence report reflects that the defendant graduated from high school in 1987. He did construction work for Gene Bennett, Sr., periodically from 1996 through 1999 and worked at Advanced Restorations from May 1997 until May 1998. The defendant reported taking prescription medicine for depression. He said he began drinking alcohol and using marijuana at age eleven or twelve. He reported that he had not used alcohol heavily since 1991 and had last used a small amount of alcohol about eighteen months before the report was prepared. He said he tried cocaine twice in 1990 and used marijuana twice a week until 1992, but he denied any other drug use. In addition to two 1991 robbery convictions and a 1993 aggravated robbery conviction, the defendant was convicted of misdemeanor possession of marijuana in 1991. The report confirms that the trial court revoked his probation for the 1991 robbery convictions. His parole stemming from his 1993 aggravated robbery conviction was revoked in August 1998, and he was again placed on parole in October 1998.

The trial court sentenced the defendant as a Range II, multiple offender and imposed the maximum ten-year sentence for his Class C aggravated assault conviction. It enhanced the defendant's sentence with factors (1), the defendant has criminal convictions or behavior in addition to that necessary to establish his range; (8), he "has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community;" and (13), he committed the present felony while on parole for a prior felony conviction. See Tenn. Code Ann. § 40-35-114 (Supp. 2001) (amended 2002). It weighed enhancement factor (8) very heavily. Although it believed that it must "stretch[] the proof" to find any mitigating factors, it observed that factor (11), the defendant "committed the crime under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct," arguably applied. See Tenn. Code Ann. § 40-35-113. It concluded that this mitigator did not carry sufficient weight to drop the sentence below the ten-year maximum. It found that Rule 32(c)(3)(A), Tenn. R. Crim. P., required the present sentence to be served consecutively to his previous sentence.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The sentence to be imposed by the trial court for a Class C felony is presumptively the minimum in the range if neither enhancement nor mitigating factors are present. Tenn. Code Ann. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors. Tenn. Code Ann. § 40-35-210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments; State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986); see State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

The defendant contends that the trial court erroneously applied enhancement factor (8) because the fact that he committed the present offense while on parole does not reflect a "previous history" of refusal to comply with a sentence of release. The state points out that the trial court applied this factor because the defendant's probation for his 1991 robbery convictions had been revoked. We agree that the record supports the trial court's application of this factor. See State v. Hayes, 899 S.W.2d 175, 186 (Tenn. Crim. App. 1995).

The defendant argues that mitigating factor (11), that his conduct does not reflect a sustained intent to violate the law, is supported by his testimony that he committed the offense during an argument with the victim in which she admitted fellating a third party in order to get money for drugs. He contends that the trial court should have given this factor more weight. The trial court gave little weight to factor (11) because it had scant factual support:

> Looking at mitigating factors, it's stretching the proof to find any mitigating factors. The only one that's arguably applicable is . . . . based completely on [the defendant's] testimony–and that is [although the defendant is] "guilty of the crime committed, the offense, under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated his conduct." Taking what [the defendant] said about those things as true, that could be considered in mitigation; but, it does not weigh heavily enough to drop the sentence down below the ten years.

The state questions the application of factor (11) because the present beating lasted over a period of hours and the defendant had beaten the victim before. We also note that Crystal Bailey's testimony about the defendant's violence toward her during their marriage contradicts the application of mitigating factor (11). In any event, if the factor is properly applied, the weight it receives is within the trial court's discretion. See Moss, 727 S.W.2d at 237. We may not give it more weight even if we were to prefer a different sentence. The evidence supports the trial court's application of enhancement factors (1), (8), and (13) and justifies the great weight it afforded factor (8). The maximum ten-year sentence imposed by the trial court is not excessive.

Based upon the foregoing and the record as a whole, we affirm the judgment of conviction.

_____
JOSEPH M. TIPTON, JUDGE